U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - ALEXANDRIA

JUL 0 3 2007

ROBERT H. SHEMWELL, CLERK
BY _____
         DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

DONNA YOUNG                        CIVIL ACTION NO. 06-1570
          Plaintiff

VERSUS

UNUM LIFE INSURANCE                JUDGE DEE D. DRELL
COMPANY OF AMERICA                 U.S. MAGISTRATE JUDGE JAMES D. KIRK
          Defendant

### REPORT AND RECOMMENDATION

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation. The case is ready for decision on briefs on the merits in accordance with the ERISA Case Order [Doc. 14/22].

### Facts

Claimant, Donna Young, was employed at CHRISTUS St. Francis Cabrini Hospital (Cabrini) as a Cardiac Evaluation Supervisor. On February 5, 2003, Young submitted a claim to Unum Life Insurance Company of America (Unum), the disability carrier for Cabrini, for disability benefits. She noted she had not worked since January 18, 2003 due to her medical problems which included fibromyalgia, chronic back pain, hypertension, chronic fatigue and depression. (R. 290). After an initial denial of benefits, Unum determined



Young was entitled to short term disability benefits for the maximum duration of 26 weeks. (R. 87). Accordingly, Young received payment for short term disability benefits through August 30, 2003.

Young's file was then transferred and reviewed for long term disability benefits. Unum issued a letter dated April 30, 2004 advising that payment of long term disability benefits had been approved for the period August 31, 2003 through April 30, 2004, but more information was needed in order to provide continuing benefits. (R. 1067-1070). This letter also cited the provision regarding the definition of disability which allowed for eighteen (18) months of disability benefits if a claimant could not perform the duties of her "regular occupation".

On March 9, 2006, after the expiration of eighteen months of long term disability payments, Unum notified claimant that the second phase of the definition of long term disability changed and Young's sickness must prevent her from obtaining "any gainful occupation", not simply inability to perform the duties of her prior occupation. Unum further advised that, based upon information in the file at that time, she met the definition of long term disability and her benefits would continue.

In fact, Young continued to receive long term disability benefits until she received a letter from Unum dated January 20, 2006 which advised her benefits ceased as of that date as an illness based upon self-reported symptoms was limited to a 24 month

benefit period. Young appealed that decision; however, the appeal was denied. Accordingly, she filed the instant action on September 14, 2006.

## Standard of Review

In accordance with this court's standing ERISA Case Order, the parties agree that the Group Disability Insurance Policy (the "Plan") issued by defendant, Unum to Cabrini is an employee welfare benefit plan, as defined by the provisions of ERISA and that this case is governed by ERISA and that all state law claims are preempted. The parties also agree that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits. Both Young and Unum agree that the administrative record is complete. However, because the administrator is both insurer and administrator and is thus conflicted, the court will give a modicum less deference to the administrator's decision. <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

## The Plan

### LONG TERM DISABILITY BENEFIT INFORMATION

**HOW DOES UNUM DEFINE DISABILITY?**
You are disabled when Unum determines that:
- You are limited from performing the material and substantial duties of your regular occupation due to your sickness and injury; and
- You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

3

After 18 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation which you are reasonably fitted by education, training, or experience. (R. 1297)

**WHEN WILL PAYMENTS STOP?**
We will stop sending you payments and your claim will end on the earliest of the following:...
- after 18 months of payments when you are able to work in any gainful occupation on a part-time basis but you chose not to;...
- the date you are no longer disabled under the terms of the program;... (R. 1292-1293)

**WHAT DISABILITIES HAVE A LIMITED PERIOD OF PAYMENT UNDER YOUR PROGRAM?**
Disabilities due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period up to 24 months...
Unum will not pay beyond the limited pay period indication above or the maximum period of payment, whichever occurs first. (R. 1291)

**GLOSSARY**

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work. (R. 1278)

**REGULAR CARE** means:
- you personally visit a physician as frequently as medically required, according to general accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards. (R. 1276)

**SELF-REPORTED SYMPTOMS** means the manifestation of your conditions which you tell your physician that are not

> verifiable using tests, procedures or clinical explanations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy. (R. 1275-1276).

### The Medical Records

The administrative record shows Young complained of muscle aches and pain to her doctors as early as 1996. Though it is unclear from the record exactly when Young was diagnosed with fibromyalgia, it is well established that both her rheumatologist, Dr. Mohammed Shbeeb, and her internist, Dr. Gerald Foret, confirmed the diagnosis and treated her accordingly.

Young was under Dr. Shbeeb's care from September 1998 through December 2004. During that time, he consistently monitored and treated her complaints related to fibromyalgia including, but not limited to, aches and pains, insomnia, and depression. Dr. Shbeeb conducted physical examinations of Young at her appointments which revealed the extent of her muscle attachment tender points. He noted the extent of these muscle attachment tender points as well as the severity of her symptoms and lack of inflammation. These symptoms remained consistent with a diagnosis of fibromyalgia and he ruled out other possible diseases or conditions which might have caused her problems, including rheumatoid arthritis and connective tissue disease.

Young was also under the care of an internist, Dr. Gerald Foret. Dr. Foret began seeing Young in August 2001. As with Dr. Shbeeb, Dr. Foret closely followed Young and her response the treatments prescribed for fibromyalgia. He noted her complaints, treatments and environmental factors which seemed to exacerbate or alleviate her pain, conducted physical examinations and performed tests to rule out other possible diseases or conditions.

In January of 2003, Dr. Foret suggested that Young take a leave from her work and go on disability as the stress and physical demands of her job were exacerbating her symptoms. In a letter to Unum dated March 11, 2003, Dr. Foret advised that he treated Young for chronic pain and fibromyalgia which manifested itself in the form of pain, headaches, fatigue and irritability. He advised that these symptoms remained constant over time despite prescribing a number of medications and he considered her illness to be severe and debilitating. Dr. Foret further advised that within a few weeks of leaving her employment, Young's fibromyalgia complaints were alleviated by approximately twenty five to thirty percent.

In a follow up letter dated June 2, 2003, Dr. Foret stressed that it was he, not Young, who insisted that she quit working due to "classic symptoms" of chronic fatigue syndrome and fibromyalgia. He stated that Young, on her best day, was limited to non-physical work and could not "tolerate even four day work weeks." Dr. Foret also wrote a letter to Young's attorney dated August 6, 2003 which

further expressed his belief that Young could not work as a Cardiac Evaluation Supervisor because the physical and mental stressors of the job; a sentiment Dr. Foret reiterated in a letter to Unum on April 19, 2005, which was sent in response to Unum's questions regarding Young's condition at the time.

Throughout the course of this claim, Unum's own medical staff reviewed Young's records. Those who reviewed the file noted that the records documented symptoms, the existence of tender points and the lack of any other diagnosis. They further noted that all of these factors supported the diagnosis of fibromyalgia. During the appeal process, Ann Marie Pidgeon, R.N. reviewed the files and found consistently reported symptoms, clinical findings of muscle attachment tender points, negative lab results and ongoing treatment for fibromyalgia. She further stated in her conclusion that the diagnosis of fibromyalgia was suitable given the existence of tender points and reported symptoms as well as the lack of an alternative explanation or diagnosis.

Dr. Woolson Doane relied upon this review of medical information when discussing fibromyalgia in his report of May 18, 2006. Like Pidgeon, he accepts the diagnosis of fibromyalgia.

### Review for Abuse of Discretion

"An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'" Lain v. UNUM Life Ins. Co. of America, 279 F.3d

337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir. 1999). See also Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 299 (5th Cir. 1999).

Limited Pay Period

Young, through counsel, argues the Administrator incorrectly determined that Young's disability, specifically fibromyalgia, was subject to the limited pay period provision.[1] For an illness to be limited to the 24 month pay period, it would have to be "primarily based" upon self reported symptoms. "Self-reported symptoms" are those symptoms reported by a patient which are not verifiable by medically accepted tests, procedures or clinical examination.

Fibromyalgia is a chronic pain illness characterized by widespread musculoskeletal aches, pain and stiffness, soft tissue tenderness, general fatigue and sleep disturbances. Fibromyalgia is a well recognized medical illness. Both Young and Unum's doctors recognize the illness as do medical organizations including, but not limited to, the National Institutes of Health,

---

[1] Unum does not provide an argument regarding this contention in its brief. Rather it simply relies upon its determination that Young no longer meets the definition of disabled.

the American College of Rheumatology and the National Institute of Arthritis and Musculoskeletal and Skin Disease. The United States Congress has even gone so far as to extend governmental funding for additional research into the causes and treatments for fibromyalgia. See, www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

Though fibromyalgia is difficult to diagnose because there is no single objective test to verify the illness and patients experience a range of symptoms of varying intensities that wax and wane over time, this does not mean the diagnosis of fibromyalgia is primarily based upon self reported symptoms. A combination of factors are considered when making a diagnosis including patient history, self-reported symptoms, physical examination, specifically, an accurate manual tender point examination and the absence of other possible diseases or conditions with similar self-reported symptoms.

In the instant case, Young was diagnosed with fibromyalgia prior to both the date of disability and the time frame covered by medical records in this administrative record. The diagnosis was confirmed by experienced, reputable medical specialists in this community; namely Dr. Shbeeb in 1998 and Dr. Foret in 2001. Unum reviewed the medical records, accepted the diagnosis and paid Young both short and long term disability benefits.

Though Young's disability, fibromyalgia, is based in part upon self-reported symptoms, it is not primarily based upon them. Even if it were, the symptoms of which Young complained, pain and fatigue, were verified using clinical examinations and/or tests accepted in the medical community. Both Dr. Shbeeb and Dr. Foret routinely conducted physical examinations to evaluate muscle attachment tender points and verify the existence of pain and tenderness. Dr. Shbeeb noted tender points at nearly every visit, and Dr. Foret noted the severity of her pain, the credibility of her statements and his certainty regarding a diagnosis of fibromyalgia. Even the Administrative Law Judge who heard Young's social security case stated that her symptoms were severe and credible, thus, further verifying the medical information regarding Young's case.

In addition to conducting these medically accepted tender point examinations, Dr. Foret and Dr. Shbeeb ran numerous blood tests and diagnostic procedures which ruled out alternative diagnoses such as connective tissue disease, rheumatoid arthritis and sleep disorders. Some of these tests even verified the existence of Young's reported symptoms. For example, the sleep studies confirmed Young suffered from insomnia and, thus, fatigue.

The doctors who treated Young and those who reviewed her claim all state a diagnosis of fibromyalgia is based upon the muscle attachment tender point test and a process of ruling out other

diagnoses. Accordingly, fibromyalgia (at least in this case) is not "primarily" based upon self-reported symptoms. Additionally, medical notes by Young's treating physicians and those who reviewed her file indicate that Young expressed complaints of pain and fatigue; her doctors conducted clinical exams and/or tests to verify her symptoms and rule out other explanations. Young had multiple muscle attachment tender point sites and those who had an opportunity to interact with Young and discuss her case verified the veracity of her statements. Accordingly, the determination that Young's disability is subject to the pay period limitation of 24 months is not supported by the administrative record.

Definition of Disabled

It is Unum's primary contention that Young should be denied long term disability benefits regardless of whether the limited pay period applies since she no longer meets the definition of disabled. According to the Unum Long Term Disability Plan, one is disabled if her illness prevents her from performing the duties of the occupation she had at the time of her disability. After 18 months, the definition of disabled changes. One is then disabled only if her illness prevents her from performing the duties of any gainful occupation for which she is reasonably fitted by education training or experience.

Unum states that Young is capable of performing the duties of any gainful occupation. In support, Unum states that Young's

doctors have not set forth any restrictions or limitations. Further, they note their Vocational Rehabilitation Consultant found Young could work in at least three positions found in the Alexandria job market.

A review of the administrative record reveals that Dr. Foret consistently provided Unum with an attending physician's statement each time Young filed or updated her disability claim. (R. 1026, 1075, 986, 696). In addition to completing these forms, Dr. Foret frequently wrote Unum and advised of Young's condition as well as her prognosis. (R. 239-238, 413, 417-416, 452-451, 865-864). In these forms and letters, he reminded Unum that fibromyalgia was a chronic pain disease which waxes and wanes. He emphatically stated that Young could not work as stress and prolonged standing exacerbated her fibromyalgia. He also stated that her condition had improved since she quit working; however, on her best day she could do non-physical work and had trouble working even four days a week. Young's restrictions included a stressful environment, decision making, deadlines and prolonged standing, and she was limited by persistent pain, fatigue and the inability to concentrate. Dr. Shbeeb agreed that Young should not work as her fibromyalgia improved in the absence of stress.

During the appeal process, Unum's medical staff disregarded these limitations as they were "self-reported" symptoms. Instead, they focused on what they contend was the only verifiable illness

12

which would impact her ability to work, a torn rotator cuff. Unum noted that none of Young's treating physicians placed restrictions or limitations on her due to the torn rotator cuff. However, Unum acknowledged it would reasonably affect her ability to do things like raise her arm, push or pull and/or lift weight. These restrictions and limitations were provided to Shannon O' Kelley, Vocational Rehabilitation Consultant for Unum, who determined that there were three jobs in the Alexandria market which Young could perform even with these rotator cuff restrictions and limitations (R. 325-320).

It is obvious that none of Dr. Foret's restrictions were noted as one of the jobs listed was Hospital Admitting Supervisor. This position required one to supervise, a restriction continuously specified by Dr. Foret. While it is true the administrator is not required to give special deference to the treating physician when confronted with contrary reliable evidence, see Black & Decker Disability Plan v. Nord, 123 S.Ct. 1965 (2003), here there is no contrary evidence. The reviewing physicians unjustifiably disregarded Dr. Foret's restrictions and limitations because they were self reported symptoms. Not only has it been determined that Young's illness was not primarily based upon self-reported symptoms, but there is nothing in the Plan which provides that

restrictions or limitations cannot be based upon self-reported symptoms.[2]

It is the opinion of Dr. Foret and Dr. Shbeeb that Young is disabled from performing any occupation due to her symptoms which are exacerbated by stress. In addition, Dr. Foret stated that when Young's symptoms were at a minimum, she still couldn't work four days a week, much less five. Ordinarily, vocational evidence is required to determine what jobs a person can perform. However, in this case, a vocational expert would not be able to find an occupation which would accommodate her restrictions because Young's doctors determined her medical condition prevented her from working at all. Accordingly, as Young is unable to perform the duties of any gainful occupation, she meets the definition of disabled set forth in the Plan.

## Conclusion

For the foregoing reasons, the Court finds, after reviewing the record and considering Unum's dual role as insurer and plan administrator, that the decision of the Administrator as to the applicability of a limited pay period to Young's claim is not supported by substantial and concrete evidence and is thus arbitrary and capricious and an abuse of discretion. Accordingly,

---

[2] In fact, the term "self-reported symptom" appears only twice in the Plan. Once in the glossary section and once in the provision dealing with disabilities subject to the pay period limitations.

long term disability benefits should be reinstated effective January 19, 2006.

Further, the decision of the Administrator that Young no longer meets the definition of disabled is not supported by substantial and concrete evidence and is arbitrary and capricious and an abuse of discretion.

Accordingly, IT IS RECOMMENDED that because the Administrator abused its discretion, Young's claim should be GRANTED and long term disability benefits should be reinstated effective January 19, 2006.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within five (5) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING**

ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 3rd day of July, 2007.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

16